Filed 12/24/15  In re A.S. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re A.S., a Person Coming Under the Juvenile Court Law. | D068342 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. RENEE L., Defendant and Appellant. | (Super. Ct. No. J516715C) |

APPEAL from orders of the Superior Court of San Diego County, Donal B. Donnelly, Judge.  (Judge of the Imperial Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Jennifer L. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Dana C. Shoffner, Deputy County Counsel, for Plaintiff and Respondent.

Patricia K. Saucier, under appointment by the Court of Appeal, for Minor.

Renee L. (Mother) appeals findings and orders declaring her daughter, A.S. (Child), a dependent of the juvenile court under Welfare and Institutions Code section 300, subdivision (j)[1] and removing Child from her custody under section 361, subdivision (c)(1). Mother contends the evidence was insufficient to support the court's findings. Further, Mother contends the court made jurisdictional findings based upon matters that were not alleged in the petition filed by the San Diego County Health and Human Services Agency (the Agency). We affirm the orders.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. *The Agency's Prefiling Investigation*

In or around February 2015, the Agency began its investigation into Child's welfare based on a child abuse hotline referral. It was reported that the maternal grandmother (Grandmother) had been heard slapping Child while Child cried, and that Child, who was almost four years old, could not talk. Grandmother was Child's primary caregiver because Mother worked and attended school. An Agency social worker visited Grandmother at her home in an assisted living apartment community. The social worker observed that Grandmother's "behaviors and demeanor were odd." For example, Grandmother played one song repeatedly throughout the 45-minute interview and paused multiple times with her eyes closed while swaying.

---

[1]     All further statutory references are to the Welfare and Institutions Code.

Grandmother denied any abuse or neglect of Child, wished to adopt Child, and attributed any negative reports to "jealous" neighbors. Grandmother said she left Child alone for 10 minutes at most when taking a break to smoke on a different floor of the building. Grandmother's neighbor stated that she had seen Child left in a stroller for extended periods of time, as well as heard "slapping" noises while the child was loudly crying, perhaps twice in the last several months. The same neighbor and the property manager had also heard Grandmother speak to Child in a cruel or demeaning way, such as calling Child a "demon," "evil," or "pain in the ass." The Agency noted that Grandmother had had her own children, including Mother, removed from her care based on sexual and physical abuse. In 1984 and 1986, Grandmother had been twice convicted of inflicting corporal injury on a child, for which she served jail time and had been on probation.

During her contacts with the Agency, Grandmother spoke and acted with religiosity and was at times strange or nonsensical. She acknowledged that Child could not yet talk and was not toilet trained. Grandmother believed a former resident's "spirit" remained in her home and Child could sense it. She stated that any of Child's developmental delays were all a part of "God's plan." She would elect to homeschool Child rather than seek external help. A public health nurse screened Child in Grandmother's home for developmental problems, and found Child was below the cutoff in the areas of "communication, personal-social, and problem solving" and on the border for motor skills. The nurse recommended a formal developmental evaluation "as soon as

3

possible." Even when urged by the Agency and nurse to consider Child's special developmental needs, Grandmother remained skeptical and believed it was "up to God."

The Agency also visited with Mother and Child at a library near Child's nap time. Child was appropriately dressed, groomed, and seated in her stroller without visible injuries. Child could not verbalize any identifiable words, but instead rocked herself in a self-soothing manner and made "throaty" noises. According to the Agency's research, by the time children reach two years old, they can typically speak in two-word sentences. Mother denied any abuse or neglect, and attributed Child's lack of speech to undiagnosed attention deficit hyperactivity disorder. Mother stated that Child had seen a pediatrician several months ago without any issues, but she was vague or evasive about the visit date. She showed proof that Child had been vaccinated through two years old. Mother would not provide her current address or release Child's medical information to the Agency, claiming to be a private person. Mother made a false statement about Child's enrollment in a daycare facility and, in general, the Agency found Mother to be uncooperative, hostile, and nonforthcoming.

The Agency's reports contain a narrative of incidents concerning Child's older half brother, Z.P. (Sibling), who had been the subject of a dependency proceeding in 2007 as a five year old.[2] Sibling was found with multiple bruises, grab marks, and a cigarette burn intentionally inflicted by his father. Sibling also came to disclose Mother's use of severe physical abuse—such as burning his hand by holding it over a stove and poking

_____

[2]     Another of Child's half brothers was also removed from Mother's care as a sibling of Z.P.

4

him in the head with a knife—as a disciplinary method. Mother's use of a stove burner for discipline was confirmed by a relative. An October 2007 psychological evaluation of Mother described the circumstances of Sibling's removal and Mother's neglect, her inability to accept responsibility for her actions, and her "pervasive pattern" of angry, impulsive behavior. Mother's parental rights to Sibling were terminated in 2009.

## II. *The Petition*

In March 2015, the Agency filed a dependency petition on behalf of Child under section 300, subdivision (j). The petition alleges, in part:

> "[S]ibling has been abused or neglected as defined in subdivision (a), (b), (d), (e) or (i), and there is a substantial risk that . . . [C]hild will be abused or neglected as defined in those subdivisions."

The petition goes on to describe instances of Sibling's physical abuse or neglect while in Mother's custody, leading to termination of parental rights:

> "COUNT 1: On or about June 24, 2007, [M]other . . . subjected . . . [S]ibling . . . to serious physical harm and the substantial risk thereof, including but not limited to excessive discipline and physical abuse and damage to wit, [Sibling] was discovered to have injuries consisting of cigarette burn on the child's back, multiple bruise[s] in the shape of fingerprints and scratches on the child's body and arms which were determined to be inflicted, [Sibling] later disclosed that his mother burned him, . . . [M]other failed to make progress on reunification services and . . . [M]other's parental rights were terminated as to [Sibling] . . . ."

The petition further alleges that Child is at substantial risk of suffering serious physical harm due to Mother's leaving Child in Grandmother's primary care:

> "[G]randmother . . . has a lengthy history of physically abusing her own children, including serving jail time for inflicting corporal punishment on a child, and . . . Child is primarily cared for by . . . [G]randmother, . . . [G]randmother has called [Child]

5

'wicked,' 'evil' and a 'devil,' neighbors have heard slapping in the home . . . as . . . [C]hild is crying, and . . . [M]other sees no concerns with . . . [G]randmother taking care of . . . [C]hild and there is substantial risk this child will suffer serious physical harm inflicted non-accidentally by her parent/guardian pursuant to . . . section 300[, subdivision ](a)."

### III. *Child's Detention and Medical Exams*

Child was initially detained in a foster home and then transferred to Polinsky Children's Center (PCC). Mother and Grandmother regularly visited Child and were observed to be gentle and affectionate during those visits. Child appeared comfortable in their presence.

While Child was detained, Mother accused the foster parents of physically and sexually abusing Child and demanded that her daughter be medically examined. Photographs were taken, and a police report was filed. The police report noted that PCC described Child as "autistic and mute." A PCC doctor performed a physical exam on Child and concluded: "I do not see any bruises currently that are suspicious for inflicted injury." The doctor confirmed that four-year-old Child was "[nonverbal]."

Subsequently, while waiting for a forensic sexual abuse exam also requested by Mother, the Agency was able to observe more of Child's behaviors. When Child could not get what she wanted (e.g., a colored pencil), she became progressively more frustrated and inconsolable—thrashing, screaming, and crying for 20 or 25 minutes. Neither Mother nor Grandmother was capable of soothing Child. In the course of her tantrums, Child hit others, threw her body around, squirmed out of anyone's reach, and almost "thrashed her head onto the floor, nearby chair and the wall." Mother and

Grandmother blamed PCC for "drugging" Child, and demanded a drug test. Grandmother also made a telephone call to "700 club prayer line," asking for a miracle to be sent. Eventually, Child became exhausted and slept through the entire forensic exam. Mother told the examining doctor that she "despise[d]" the Agency's social worker. The exam reported normally, finding no evidence of sexual abuse, tears, or penetration.

IV. *Jurisdiction and Disposition Hearing*

At the contested jurisdiction and disposition hearing, the court admitted the Agency's detention, jurisdiction/disposition, and addendum reports in evidence without objection, including the following attachments: (1) the public health nurse's visit summary; (2) Mother's 2007 psychological evaluation; (3) the PCC medical report, photos, and police report related to Mother's accusations of Child's abuse by her foster parents; (4) Child's forensic exam report; and (5) a social worker's curriculum vitae. Mother offered a parenting class certificate of completion into evidence, which was admitted. Based on this evidence, the court made a true finding on the petition's section 300, subdivision (j) allegations by a preponderance of the evidence. The court acknowledged that it did not have "a lot of detail" about Sibling's prior neglect or abuse, but the evidence sufficiently showed that Sibling had been previously adjudicated "abused or neglected . . . in the juvenile court dependency system," and the Agency's summary indicated the abuse or neglect had been severe.

In addition, the court considered multiple factors and found that Child faced a "substantial risk of abuse or neglect." The court considered (1) the severity of Sibling's abuse or neglect and Mother's failure to reunify; (2) Mother's inability or unwillingness to

7

assist in Child's "educational, medical, and developmental needs"; (3) Mother's failure to meet certain of Child's basic needs, such as toilet training and socialization; and (4) Mother and Grandmother's personalities and behavior, which were aggravating Child's risk of harm. Based on all the evidence, including severe developmental delays, the court inferred that Child was at "risk of neglect." The court found by clear and convincing evidence that Mother was unable or unwilling to meet all of Child's needs, and Child must be removed from Mother's care based on a substantial danger to Child's physical and emotional health. This appeal followed.

## DISCUSSION

### I. *Jurisdiction Under Section 300, Subdivision (j)*

#### A. *Guiding Principles*

A juvenile court may determine a child is subject to the court's jurisdiction if it finds by a preponderance of the evidence that "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions." (§ 300, subd. (j).) "[S]ubdivision (j) has two prongs . . . ." (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 566.) "[A] child under subdivision (j) must be both a sibling of an abused child *and* at risk of being abused." (*In re Carlos T.* (2009) 174 Cal.App.4th 795, 803.)

To determine whether the child is at substantial risk of being abused or neglected, the juvenile court considers "the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling,

8

the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child." (§ 300, subd. (j); *In re I.J.* (2013) 56 Cal.4th 766, 774 ["[T]he trial court is to consider the totality of the circumstances of the child and his or her sibling in determining whether the child is at substantial risk of harm . . . ."].) The child does not need to be " 'abused or neglected *as defined in the same subdivision* that describes the abuse or neglect of the sibling.' " (*In re I.J.*, at p. 774, quoting *In re Maria R.* (2010) 185 Cal.App.4th 48, 64 (*Maria R.*).)

B. *Sufficiency of Evidence to Support Jurisdiction*

"On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) The evidence must be reasonable in nature, credible, and of solid value. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order at issue. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

1. *Abuse or Neglect of Sibling*

Mother first contends the evidence insufficiently shows that Sibling had been subjected to abuse or neglect. She takes particular issue with the Agency's preparation of summaries of documents from Sibling's case file.

We conclude that the Agency's reports and Mother's psychological evaluation, which were admitted into evidence without any objection, adequately present the severe

9

circumstances of Sibling's abuse or neglect, as defined in at least one of the relevant subdivisions of section 300.  (See *In re Malinda S.* (1990) 51 Cal.3d 368, 385 [social workers' reports "are both admissible and competent evidence on which to base a finding of jurisdiction pursuant to [§] 300"]; Cal. Rules of Court, rule 5.684(c) [social studies with hearsay are admissible and sufficient to support jurisdictional finding].)  The evidence showed that Mother intentionally used a stove to burn Sibling as a means of discipline, failed to protect Sibling from serious physical abuse by his father, Mother exhibited angry and violent impulses, and was unable to reunify with her children.

Although evidence concerning the particular statutory ground for jurisdiction over Sibling would have been helpful to the juvenile court (and we are perplexed by the Agency's failure to have presented such evidence from Sibling's dependency case file), we do not find it was necessary in this case in light of details set forth in the detention and jurisdiction/disposition reports about the facts of Sibling's case.  The record sufficiently supports, at minimum, that Mother failed to protect Sibling from serious physical harm under section 300, subdivision (b).[3]  Accordingly, the first prong of the test under section 300, subdivision (j) was satisfied.

---

[3]     On appeal, the Agency requests we take judicial notice of the petition and jurisdiction/disposition order from Sibling's 2007 dependency case, showing that Sibling was removed from Mother's care under section 300, subdivision (b).  Mother opposes judicial notice, arguing that the documents were not submitted to, or considered by, the juvenile court, and there is no reason that they could not have been.  We agree that the Agency did not offer the documents as evidence for the trial court's consideration, and deny the Agency's request for judicial notice.

10

2.    *Substantial Risk of Abuse or Neglect of Child*

Mother next contends the evidence insufficiently shows that Child was at current risk of abuse or neglect. She acknowledges Child need not be at risk of the *same* kind of abuse or neglect as Sibling, which is correct. "[S]ubdivision (j) directs the trial court to consider whether there is a substantial risk that the child will be harmed under subdivision (a), (b), (d), (e) *or* (i) of section 300, notwithstanding which of those subdivisions describes the child's sibling." (*Maria R., supra*, 185 Cal.App.4th at p. 64.) The Agency argues that Child's risk of harm is appropriately analyzed under section 300, subdivision (b). We agree with the Agency.

Under section 300, subdivision (b), the Agency must show: "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820 (*Rocco M.*).) "Cases finding a substantial physical danger tend to fall into two factual patterns. One group involves an *identified, specific hazard* in the child's environment—typically an adult with a proven record of abusiveness. [Citations.] The second group involves children of such tender years that the absence of adequate supervision and care poses an inherent risk to their physical health and safety." (*Id.* at p. 824.)

Based on our review of the record, the evidence sufficiently supports that Child was at substantial risk of serious physical harm under section 300, subdivision (b), thus satisfying the second prong of a jurisdictional finding under subdivision (j). Child suffers from severe developmental delays, which both Mother and Grandmother ignored and/or

11

left untreated. At four years old, Child could not utter a single word, was deficient in problem-solving skills, and was not socialized. The repercussions of leaving these deficiencies untreated are severe. We draw the reasonable inference that Child's developmental delays placed her maturity level and mental capabilities on par with a two-year-old (or younger) toddler in certain respects, such that an "absence of adequate supervision and care poses an inherent risk to [her] physical health and safety." (*Rocco M., supra*, 1 Cal.App.4th at p. 824.) Mother had abdicated primary caretaking responsibilities of Child to Grandmother. With Grandmother, there was a substantial risk that Child could be seriously injured when left alone or unsupervised as she often was, or through a violent tantrum from being overwhelmed, frustrated, and unable to communicate.

Moreover, consistent with the requirements of section 300, subdivision (j), the juvenile court considered a number of probative factors in determining there was a substantial risk of harm to Child, all of which were supported by substantial evidence. Importantly, the court did not rely on one single factor to the exclusion of others. Mother essentially asks us to reweigh the facts to find, for example, that she was more cooperative than the court gave her credit for. It is not our role to reweigh the evidence. The court appropriately considered Mother's current behavior, which included bouts of hostility and antagonism, in conjunction with past observations about Mother—angry, impulsive, lack of insight, unable to accept responsibility—as part of its finding that Child was at risk of harm. In sum, evidence amply supports the existence of a substantial risk Child would suffer serious physical harm as a result of parental neglect.

12

## C. *Notice Issues*

Mother contends the juvenile court based its jurisdictional findings on "matters not alleged," i.e., Mother's inability or unwillingness to meet Child's developmental needs. Mother contends the lack of notice resulted in her having an inadequate opportunity to offer evidence and refute the matter.

To the extent Mother challenges the Agency's petition as deficient or overly vague, we conclude the argument has been waived. (*In re S.O.* (2002) 103 Cal.App.4th 453, 459 [" 'If the parent believes that the petition does not "adequately communicate" the [Agency]'s concerns or is otherwise misleading, the onus is on the parent to challenge the petition at the pleading stage.' "].) Had Mother timely objected to the petition or requested clarification on the jurisdictional allegations, the Agency could have filed an amended or supplemental petition, if appropriate.

In any event, Mother had notice that the Agency was alleging jurisdiction on section 300, subdivision (j) grounds, which by its nature encompasses a "totality of circumstances" risk analysis based on other subdivisions of section 300. If there was any doubt, the petition's first general allegation states: "[S]ibling has been abused or neglected as defined in subdivision (a), (b), (d), (e), or (i), and there is a *substantial risk that . . . [C]hild will be abused or neglected as defined in those subdivisions*." (Italics added.)

Although the Agency specifically alleged that Child was at risk of suffering serious physical harm "inflicted non-accidentally," under section 300, subdivision (a), the court was not so limited in performing its risk assessment, and a fair reading of the

13

petition conveys the Agency's simultaneous concern of Mother's indifference to Child being left with an unsuitable caretaker. Furthermore, in each of the Agency's reports admitted in evidence, which Mother received in advance, the Agency's concerns regarding Child's developmental issues are explained in detail. Mother had the opportunity to rebut the Agency's reports if she desired. Finally, as we discussed above, the court arrived at its jurisdictional finding after considering a number of probative factors, not all of which were required to be set forth in the petition. The court's finding on jurisdiction is supported by substantial evidence.

II. *Disposition of Removal Under Section 361, Subdivision (c)*

Mother's final contention on appeal is that substantial evidence did not support the juvenile court's disposition order removing Child from Mother's care. We disagree.

At the dispositional hearing, there is a statutory presumption the child will be returned to parental custody. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 308.) A child who is a dependent of the juvenile court shall not be removed from the home unless there is clear and convincing evidence of a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being, and there are no reasonable means to protect the child's physical health without removing the child from parental custody. (§ 361, subd. (c)(1); *In re Henry V.* (2004) 119 Cal.App.4th 522, 528; *In re Jasmine G.* (2000) 82 Cal.App.4th 282, 288.)

Despite the burden of clear and convincing evidence required for the removal of a child from parental custody at disposition, "[w]e employ the substantial evidence test, however bearing in mind the heightened burden of proof." (*In re Kristin H.* (1996) 46

14

Cal.App.4th 1635, 1654.) Here, we examine the record for evidence supporting the court's finding there was a substantial danger to Child's physical or emotional well-being, and there were no reasonable means to protect Child's physical health without removal from parental custody. (§ 361, subd. (c)(1).)

There is an overlap between the court's finding at jurisdiction based implicitly on the underlying *substantial risk of serious physical harm* under section 300, subdivision (b), and the court's removal finding at disposition based on *a substantial danger to the physical health* of the child under section 361, subdivision (c)(1). (See *Rocco M., supra,* 1 Cal.App.4th at p. 826 [referring to earlier version of the statute].) As noted, the evidence supports the finding that Child is at a substantial risk of serious physical harm. (§ 300, subd. (b)(1).) Thus, substantial evidence supports a finding of "substantial danger" under section 361, subdivision (c)(1).

Additionally, the record supports that there were no reasonable means to protect Child's physical and emotional health without removing her from Mother's custody. Mother either denied or minimized Child's special educational and developmental needs and was entirely comfortable with Grandmother's care of Child. Indeed, Mother supported Grandmother's proposed adoption of Child, and Grandmother, in turn, would not seek any treatment for Child. Mother had shown herself to be antagonistic to the Agency, which posed a significant risk to her daughter's receipt of appropriate treatment and services. Child was in need of consistent, dedicated, and specialized care, which Mother and Grandmother had historically ignored or refused to obtain. In addition, Child was unable to communicate her needs and possessed a toddler-like awareness of her

15

surroundings.  Substantial evidence supports that Mother and Grandmother were incapable and unwilling to provide the consistent supervision and treatment to ensure Child's physical and emotional well-being, necessitating Child's removal from their care.

## DISPOSITION

The orders are affirmed.


HALLER, Acting P. J.

WE CONCUR:


AARON, J.


IRION, J.